Filed 9/15/22  P. v. Camacho CA2/5
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B292093 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA144840) |
| v. | |
| JUAN CARLOS CAMACHO et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Julian C. Recana, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant Juan Carlos Camacho.

Law Office of Austin R. Dove, Austin R. Dove, for Defendant and Appellant Adan Muniz.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

1

Assistant Attorney General, Amanda V. Lopez and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

---

## I. INTRODUCTION

A jury convicted defendants and appellants Juan Carlos Camacho and Adan Muniz of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)[1]) and willful, deliberate, and premeditated attempted murder (§§ 664/187, subd. (a)).  The jury found true the allegation that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members.  (§ 186.22, subd. (b)(1)(C).)  It further found true the allegation that in the commission of each offense Muniz personally inflicted great bodily injury on the victim.  (§ 12022.7, subd. (a).)  The trial court found true the allegations as to both offenses that Camacho had two prior serious and/or violent felony convictions (§§ 667, subds. (a)(1) & (b)-(j); 1170.12, subd. (b)) and served two prior prison terms (§ 667.5, subd. (b)) and Muniz served one prior prison term (§ 667.5, subd. (b)).  The court sentenced Camacho to 45 years to life in state prison and Muniz to 13 years to life in state prison.

In his opening brief, Camacho contended insufficient evidence supported the gang enhancement findings; the trial court erred in allowing the prosecution to use one of his bifurcated prior convictions as a predicate offense to prove the

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

2

gang enhancement allegations; we were required to reverse his conviction for premeditated attempted murder in light of Senate Bill No. 1437 which abrogated the natural and probable consequences doctrine; if we rejected his Senate Bill No. 1437 contention, then the court erred in failing to instruct the jury that he had to act with premeditation in committing the willful, deliberate, and premeditated attempted murder; we should remand the matter to allow the court to exercise its discretion whether to strike his section 667, subdivision (a) sentence enhancements as provided by Senate Bill No. 1393; the court erred in imposing a consecutive 10-year gang sentence enhancement; and we should strike his section 667.5, subdivision (b) prior prison term sentence enhancements as provided by Senate Bill No. 136.

In his opening brief, Muniz contended the trial court erred in denying his motion to disclose the identity of a confidential informant; the court erred in failing to bifurcate trial on the gang enhancement allegations; insufficient evidence supported the assault with a deadly weapon and willful, deliberate, and premediated attempted murder offenses; and insufficient evidence supported the gang enhancements.

On January 10, 2020, we filed our opinion reversing Camacho's and Muniz's section 667.5, subdivision (b) prior prison term sentence enhancements and remanding the matter for the trial court to exercise its discretion whether to strike Camacho's section 667, subdivision (a) sentence enhancements and for the court to strike Camacho's and Muniz's section 186.22, subdivision (b)(1)(C) 10-year terms and impose 15-year minimum parole eligibility terms under section 186.22, subdivision (b)(5).  We otherwise affirmed the judgments.

3

On February 11, 2020, Camacho filed a petition for review in the California Supreme Court. Muniz did not file a petition for review. On March 18, 2020, the California Supreme Court granted Camacho's petition for review. On February 16, 2022, the Supreme Court transferred the matter back with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551) and *People v. Lewis* (2021) 11 Cal.5th 952.

On March 2, 2022, Camacho filed a post-transfer supplemental brief in which he argues we must reverse his attempted murder conviction pursuant to Senate Bill No. 775. He also contends he is entitled to the ameliorative benefits of other legislation that became effective while his appeal was pending. That is, pursuant to Assembly Bill No. 333 (Stats. 2021, ch. 699), we must reverse his gang enhancement; pursuant to Assembly Bill No. 1869 (Stats. 2020, ch. 92), we must vacate the unpaid balance of the trial court order that he pay attorney fees; pursuant to Assembly Bill No. 177 (Stats. 2021, ch. 257), we must vacate administrative fees on restitution fine collections; and on remand, the court must follow the upper-term sentencing limitations in Senate Bill No. 567 (2021–2022 Reg. Sess.; Stats. 2021, ch. 731). He further contends we should order the trial court to correct a clerical error in the abstract of judgment. Finally, as in his opening brief, he states we must strike his section 667.5, subdivision (b) priors and remand the matter for the court to exercise its discretion whether to strike his section 667, subdivision (a) sentence enhancement.

On March 17, 2022, Muniz also filed a post-remand supplemental brief. In his brief, Muniz argues that we must reverse his gang enhancement pursuant to Assembly Bill

4

No. 333.  On June 6, 2022, we asked the Attorney General and Muniz to file supplemental briefs addressing whether Muniz's judgment became final by virtue of his failure to file a petition for review in the California Supreme and thus this court does not have jurisdiction to consider his Assembly Bill No. 333 argument. Both parties filed supplemental briefs.

We reverse Camacho's willful, deliberate, and premeditated attempted murder conviction and Camacho's and Muniz's gang sentence enhancements and remand for further proceedings.  The prosecution may retry Camacho on the willful, deliberate, and premeditated murder charge and Camacho and Muniz on the gang sentence enhancement allegations.  We otherwise affirm.

## II.  BACKGROUND

On May 20, 2017, Camacho and his girlfriend, Maribel Sanchez, lived in a house on West Reeve Street in Los Angeles. Maribel's sister, Elizabeth Sanchez, also lived in the house. Maribel and Elizabeth's sister, Mariana Sanchez, and her fiancé, Jose Duran, lived in a building or back room on the property.

Duran, known as "Wolf," Mariana, known as "Crazy," and Elizabeth had been members of the Compton Vato 70 (CV70) gang.  On May 20, 2017, they were no longer active in the gang. Camacho, known as "Stomper," and Maribel were members of the Compton Vato Tres (CV3) gang.  According to Duran, CV70 and CV3 were rival gangs.

In the early morning of May 20, 2017, Elizabeth went to the back room and asked Mariana to come to the house to speak to her about something.  When Mariana entered the house, Elizabeth was in the hallway and Camacho and Maribel were in

5

a bedroom.  Elizabeth was upset that someone had used her cell phone to remove money from her boyfriend's tax account.  When Mariana said that she had been in the back room, Elizabeth turned to Maribel.

Duran entered the house.  He knew "they" were on drugs and told Mariana, "[T]hey are tweakers.  Leave them alone."  Camacho was offended at being called a "tweaker."  Duran said, "If you associate with one, you will be considered one."  Camacho punched Duran in the mouth.  Duran told Camacho to fight him outside.

Duran and Camacho fought and fell to the ground.  Duran believed he won the fight.  Although Camacho hit him in the face, he was not injured.  Duran "busted" Camacho's lip.  A neighbor told them to stop fighting, and they complied.

After the fight, Duran threw his bike over the fence—the gate was locked and he did not have a key—and jumped over.  He went across the street to speak with and get help from his friend Luis, a CV70 gang member.  Luis was not home.  At the same time, Camacho and Maribel talked on the porch.

Mariana went inside the house and confronted Elizabeth about the problem she had caused.  Camacho joined the argument, also confronting Elizabeth.  Maribel was speaking on the phone two to three feet from Mariana.  Mariana could hear her conversation.  Maribel said, "'Some shit is going down.'"  She also said, "'Well, Stomper got down with Wolf from 70s, and because Jose had run across the street.'"  She said, "[H]e is from 70s, and because Stomper [is] from CV3, it is a hood matter now."[2]

---

[2]     A Los Angeles County Sheriff's Department detective testified that Mariana told him Maribel said, "'Hey, there is shit

At some point during Mariana's argument with Elizabeth, Maribel asked Elizabeth for the front gate key. Elizabeth handed Maribel the key and Maribel walked out the front door.

Unable to speak with Luis, Duran returned home. Believing Camacho had treated him disrespectfully, Duran confronted Camacho, saying, "Round 2." At first, Camacho did not want to fight, but ultimately agreed. As Duran and Camacho fought, Camacho pinned Duran's back against a van. According to Duran, Camacho "switched [him] over" so he was facing the van. Duran and Camacho were "locked"—Duran did not know why Camacho held him for so long. Then, Duran "was seeing stars and [his] lights went out."

Mariana remained inside talking with Elizabeth. Mariana heard Duran and Camacho fighting. After a couple of minutes, she heard Duran make a "weird like gag noise." Mariana looked out the window and saw a hand and a hammer.

Mariana ran outside. Maribel stood holding the gate key. The gate was open. Duran was on the ground on one knee, trying to keep himself upright by holding onto the van. He then dropped down on all fours. Camacho stood in front of Duran and Muniz stood behind Duran. Muniz was swinging a hammer downward on top of Duran's head. Muniz struck Duran's head two to three times causing blood to splatter. As Muniz struck Duran with the hammer, Camacho punched Duran in the face two or three times. Duran was not armed with a weapon during the fight and, as far as Duran knew, Camacho was not armed.

---

going down with the 70. You need to come through. This is CV3 all the way.'" That statement does not appear in the apparent recorded transcript of the interview played for the jury.

Trying to shield Duran, Mariana ran between him and Camacho and Muniz. Camacho backed away. As she hugged Duran, Muniz struck her on the neck with the hammer four times. Mariana grabbed the hammer and Muniz yelled at her to let go of it. They struggled over the hammer. Elizabeth came outside and yelled, "'That is my sister.'" Elizabeth grabbed the hammer and Muniz and Mariana both let it go.

Duran was unconscious. Mariana called out to him, but there was no response. She pulled on him and he "kind of woke up." Mariana guided Duran back to their room. Duran had two deep holes on the top of his head and was bleeding.

Muniz yelled for Mariana to bring out Duran. Mariana stood outside in front of her and Duran's room to prevent Muniz from entering. Muniz reached for a gun in his pants. Mariana refused to bring out Duran.

After Mariana refused to bring out Duran, she and Muniz calmed down and had a conversation. Muniz said "[h]e received a call saying because Jose was from 70s and he was from, I guess, a different gang, Mr. Camacho, that is why he was there." Mariana told Muniz that it was a family matter. Muniz responded, "'Well, this is my brother-in-law. I am here to back him up.'" Mariana insisted it was a family matter and she "started explaining to him how the issue happened."

Muniz grinned and said to Mariana, "[Y]ou should be on a reality show for families." Muniz and Mariana shook hands, and Muniz said, "'My bad for hitting you with the hammer.'" He said he did not know that she was "'the sister.'" Muniz and Camacho left the property.

Mariana called 911. In the call, she described Duran's attackers as "just Mexican, bald headed and that's it." Later in

the call she said, "One was wearing some blue shorts and a black shirt and the other was wearing a sweater." At first, Mariana said the assailants "ran" and that she did not know where they went, then she said she was unsure if they left on foot or in a car, and finally she said that she was pretty sure they left in a car. When Sheriff's Department deputies arrived, Mariana described the assailant with the hammer as "30 to 35 years old, 5' 11", with a dark complexion, thin build, and bald head.

On December 7, 2017, Mariana identified Muniz from a group of six photographs (photo array) as the man who struck Duran with a hammer. Mariana was sure of her identification. At trial, Muniz's counsel asked Mariana, "Would it change your mind if you knew Mr. Muniz was 24 years old on that day?" Mariana responded, "He don't look that age to me. He looks older." Muniz's counsel represented that he was 5' 7" and had Muniz stand next to him. He then asked Mariana if there was any chance Muniz was 5' 11". Mariana said, "No." Muniz's counsel then asked, "It couldn't possibly have been Mr. Muniz?" Mariana responded that Muniz was the assailant with the hammer and she was "not good with heights."

Mariana admitted that she had given several different versions of what happened on May 20, 2017, and added some significant details. She explained that she did not tell the full story "at the beginning." She stated, "[I] was lying about it, especially when they went to pick up [Duran], the paramedics. I did lie about it. I didn't want to get involved with the court and none of that, but at the end of the day, my husband is going through a long recovery. It's not fair for him for me to just keep my mouth shut and let the people who did it walk away. It is not fair."

Los Angeles Sheriff's Department Detective Eric Gomez testified as the prosecution's gang expert. According to Detective Gomez, members of the same gang typically help one another commit crimes. A gang member is required to help if a fellow gang member asks for help. The failure to provide help could result in negative consequences including beatings or expulsion from the gang.

Detective Gomez was familiar with the CV3 gang. He knew Camacho and Muniz to be CV3 gang members. Camacho had the moniker "Stomper." Detective Gomez had not had contact with Camacho for over five years. He last had contact with Muniz in 2013. Detective Gomez did not know CV70 and CV3 normally to be rival gangs.

The prosecutor gave Detective Gomez the following hypothetical fact pattern and asked whether the "crime could be committed for the benefit of, at the direction of, or in association with a criminal street gang, with a specific intent to promote or further or assist in criminal conduct by members of that gang":

"[A]ssume gang member A is a member of the Blue gang, and gang member A gets in a fight with a member of a Yellow gang. That fight ends. Gang member A then has a conversation with his girlfriend, who also happens to be a member of Blue gang. The girlfriend—this is happening at a home. The girlfriend goes inside of the home, makes a phone call. As the girlfriend is making this phone call, a witness present at this home walks inside and overhears this conversation and hears the girlfriend tell the person on the phone that some shit is going on with the Yellow gang, this is the Blue gang, and this is some hood shit.

"Following this phone call, minutes later, gang member A and the member of the Yellow gang starts to fight again. As they are fighting, another individual, gang member B, is also a member of the Blue gang, shows up with a hammer, striking the member of the Yellow gang three times in the head, while gang member A is also punching this person all over his body. The witness tries to intervene, and gang member B reaching towards his waistband towards a gun and wants to continue fighting. Gang member B then tells the witness that he was told that something was happening and that this was a hood thing."

Based on the hypothetical fact pattern, Detective Gomez opined that the second fight was for the benefit of the Blue gang. He testified, "I think the fact that the gang member A from the Blue gang and the other individual from Yellow gang, their fight is one thing, but as soon as the phone call is made and statements are made regarding this is against the Yellow gang and that this is a hood thing, then it does become a gang incident.

"I believe the other Blue gang member that shows up with a hammer and starts attacking the Yellow gang member is also in support of the gang incident.

"I think with all of that, yes, it is in the benefit of the gang, because—at the beginning it is just a fight between Yellow and Blue. But once the other Blue shows up and they jump in and he starts attacking him with the hammer, it becomes pretty much a beat down, and I think that that is—he is helping out his fellow gang member. I believe it instills fear in the Yellow gang, showing that individual from the Yellow gang and whoever sees him in the hospital that this is what happens when you mess with the Blue gang.

11

"I think anybody—any witnesses that are neighbors that happen to be walking down the street or looking out a window or looking out a car and sees this happening, I believe that also instills fear in them, showing that this is what could possibly happen to you if you go against anything or if you attack or get into a fight with someone from the Blue gang. So it benefits the Blue gang by bolstering their street credit or intimidation among people, neighbors, people on the street, which in turn would allow them to continue with any type of criminal enterprise, such as dealing drugs or committing street robberies for fear that if they go against this Blue gang, this could possibly be what happens to you if you go against Blue."

Detective Gomez added that the third Blue gang member would have been working in association with the first Blue gang member. There would have been consequences for the third Blue gang member had he not shown up and backed up the Blue gang after receiving a call that there was an issue between the Blue and Yellow gangs.

According to Detective Gomez, people get in fights, even if they are gang members, because they are mad at each other. Sometimes, people get in fights because their girlfriends are mad at each other.

## III. DISCUSSION

A.    *Nondisclosure of Confidential Witness*

During the preliminary hearing, Detective Jose Arias testified that after receiving information from a confidential informant, he included Muniz's photograph as part of a photo

12

array that he showed to Mariana.  Mariana chose the photograph of Muniz as being the person who had struck Duran with a hammer.  On April 4, 2018, Camacho filed a motion to disclose the identity of the confidential informant.  Muniz joined in the motion.  On April 30, 2018, the trial court conducted an in camera hearing and denied the motion, concluding that the informant was not a material witness.

Muniz contends that the trial court erred and requests that we review the sealed reporter's transcript for April 30, 2018, to determine whether there was any such error.

The prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant.  (*Eleazer v. Superior Court* (1970) 1 Cal.3d 847, 851.)  An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant.  (*People v. Borunda* (1974) 11 Cal.3d 523, 527.)  "However, an informant is not a material witness when "'he simply points the finger of suspicion toward a person who has violated the law . . . .'" [Citation.]" (*People v. Wilks* (1978) 21 Cal.3d 460, 469.)  We review the trial court's ruling concerning the disclosure of a confidential informant under the abuse of discretion standard.  (*People v. Hobbs* (1994) 7 Cal.4th 948, 976.)  Here, based on our review of the sealed transcript, we hold that the court did not err in denying disclosure of the in camera hearing and in sealing the transcript.

13

B.      *Sufficiency of the Evidence*

Muniz contends that insufficient evidence supported his assault with a deadly weapon and willful, deliberate, and premeditated attempted murder convictions.  Muniz and Camacho argue that insufficient evidence supported the gang enhancement findings.

1.      Standard of Review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  The same standard applies to a claim that insufficient evidence supported a jury's gang enhancement finding.  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321–322.)

14

2.    Substantive Offenses

Muniz argues insufficient evidence supports his assault with a deadly weapon and attempted murder convictions because Mariana's identification of him as the assailant with the hammer was unreliable and inconsistent.  We disagree.

Muniz argues that "three substantial inconsistencies" in Mariana's testimony "prohibit[ed]" a rational trier of fact from finding her credible.  First, Mariana offered different accounts of whether the assailants left together or separately and whether they left in a car or on foot.  Second, she offered different accounts of which assailant was armed with a gun.  Third, she admitted lying about the incident and adding significant details.  Mariana's identification[3] of Muniz as the assailant with the hammer also is not credible, Muniz argues, because he did not match the physical description Mariana gave of the assailant.

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.  [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

---

[3]    Muniz notes that his counsel, in closing argument, pointed out "problems" with the photo array—Muniz was the only one wearing a red shirt, his photo was first in the array, and he was the baldest man in the array.  Muniz does not argue that the photo array was unduly suggestive rendering Mariana's identification a due process violation. (See *People v. Avila* (2009) 46 Cal.4th 680, 698.)

15

Mariana identified Muniz from a photo array pretrial as the assailant who struck Duran with the hammer and was sure of her identification. She again identified defendant at trial as the assailant with the hammer. It was the jury's role to resolve any issues with Mariana's credibility. (*People v. Young, supra*, 34 Cal.4th at p. 1181.) Mariana's identification of Muniz was neither physically impossible nor inherently improbable. Accordingly, it was sufficient to support Muniz's conviction. (*Ibid.*)

### 3. Gang Enhancements

#### a. Claim the offenses were for personal and not gang reasons

Camacho and Muniz argue that insufficient evidence supports the gang enhancement findings because the evidence shows that the assault and attempted murder were committed for personal and not gang reasons. We disagree.

Camacho argues, "The incident itself began as a family matter. That Mariana heard Maribel on the phone talking to someone and referring to CV3 and a 'hood matter,' did not necessarily make the resulting assault with a hammer on Duran a gang case." Principally, Camacho and Muniz rely on Mariana's statement to Muniz after Muniz struck Duran with the hammer that the fight between Camacho and Duran was a family matter, and Muniz's response that he was there to back up his brother-in-law.

Viewing the evidence in the light most favorable to the prosecution, substantial evidence supports the jury's gang

16

enhancement findings. The evidence demonstrates that the dispute between Camacho and Duran began as, and the first fight concerned, a family matter. Prior to the second fight, however, that dispute turned into a gang matter.

After the first fight, Duran, an inactive CV70 gang member, jumped over the fence and attempted to contact his friend Luis, a CV70 gang member. Camacho, a CV3 gang member, spoke with Maribel, also a CV3 gang member. After that conversation, Maribel went inside the house and made a phone call during which she said, "Well, Stomper got down with Wolf from 70s, and because Jose had run across the street." She said, "[H]e is from 70s, and because Stomper from CV3, it is a hood matter now." She further said, "Hey, there is shit going down with the 70. You need to come through. This is CV3 all the way." Maribel then obtained the key and opened the property's gate, allowing CV3 gang member Muniz to enter the property. During the second fight, Camacho "locked" up Duran and turned him around so his fellow gang member Muniz could strike him with a hammer. When Duran fell to the ground, Camacho punched him in the face while Muniz struck him with the hammer.

In addition, Muniz admitted the attack was gang-motivated. After Mariana refused Muniz's demand to bring out Duran from her and Duran's room after the second fight, she and Muniz calmed down and had a conversation. Apart from claiming he was there to back up his brother-in-law, Muniz said "[h]e received a call saying because Jose was from 70s and he was from, I guess, a different gang, Mr. Camacho, that is why he was there."

17

Given a set of hypothetical facts based on this case, Detective Gomez, the prosecution's gang expert, testified that the offenses were committed for the benefit of a gang. Once the girlfriend in the hypothetical made the phone call in which she referred to a rival gang and said, "[T]his is a hood thing," the dispute became a gang incident. The third Blue gang member was working in association with the first Blue gang member.

### b. Assembly Bill No. 333

Camacho and Muniz contend that in light of Assembly Bill No. 333's changes to section 186.22, we must reverse the true finding on the criminal street gang enhancement. The Attorney General agrees as do we.[4]

Assembly Bill No. 333 narrowed section 186.22's definition of a "'criminal street gang'" and altered the section's requirements for proving a "'pattern of criminal gang activity.'" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344–345 (*Lopez*).) We agree with the parties that Assembly Bill No. 333, which took effect on January 1, 2022, applies retroactively to defendants' non-final appeals.[5] (*Lopez, supra*, 73 Cal.App.5th at pp. 343–344.)

---

[4] In transferring this matter back to this court, the Supreme Court ordered that we vacate our prior decision. It did not limit its order only to that part of our decision that related to Camacho. Accordingly, we interpret the court's order as also applying to Muniz and thus we have jurisdiction to consider Muniz's Assembly Bill No. 333 argument.

[5] The Attorney General agrees that the provisions of Assembly Bill No. 333 that are at issue in this appeal apply

Camacho and Muniz argue, in part, that the prosecution presented insufficient evidence to show CV3 engages in a pattern of criminal activity under Assembly Bill No. 333's amendments to section 186.22 because neither of the predicate offenses on which the prosecution relied—Steve Granada's 2009 conviction for violating section 12021, subdivision (a)(1) and Camacho's 2008 conviction for violating section 245, subdivision (a)(2)—occurred within three years of the offenses in this case—committed in 2017—as section 186.22, subdivision (e)(1) now requires. The Attorney General concedes that evidence was insufficient to show a pattern of criminal activity under the amended statute.

"When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71–72 & fn. 2 . . . .) Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the question of whether [the evidence established the new element] was not relevant to the charges at the time of trial and accordingly, this question was never tried. (See [*Id.*] at pp. 69–72 & fn. 2.)" (*People v. Eagle* (2016) 246 Cal.App.4th 275, 280.) Accordingly, we reverse the true findings on Camacho's and Muniz's criminal street gang enhancements and remand with directions to permit the prosecution to retry those enhancements under the current law if it so elects. (*Ibid.*)[6]

_____

retroactively. The Attorney General disputes that newly-enacted section 1109 applies retroactively.

[6] Muniz additionally challenges his convictions on the grounds that the trial court erred in failing to bifurcate the trial on the gang allegations, under the law as it existed at the time of

19

C. *The Prosecution's Use of Camacho's Bifurcated Prior Conviction to Prove the Gang Allegations*

Camacho contends the trial court abused its discretion under Evidence Code section 352 when it permitted the prosecution to use one of his bifurcated prior convictions as a predicate offense in proving the gang allegation. Because we reversed Camacho's gang enhancement above, this contention is now moot.

D. *Senate Bill No. 775*

Camacho contends we must reverse his willful, deliberate, and premeditated attempted murder conviction, which rested on a natural and probable consequences theory of aiding and abetting, in light of Senate Bill No. 775. We agree.

On October 5, 2021, during the pendency of this appeal, the Governor signed Senate Bill No. 775 which amended section 1170.95 (now section 1172.6) to permit resentencing of certain persons convicted of attempted murder under a natural and probable consequences theory of guilt. (§ 1172.6, subd. (a).) The

---

trial, and that the introduction of gang evidence at trial "may have prejudiced the jury members to view [him] in a more negative light . . . ." The Attorney General argues Muniz forfeited this issue by failing to move for bifurcation in the trial court. We agree with the Attorney General. (*People v. Hinton* (2006) 37 Cal.4th 839, 894 [the failure to object to the admission of evidence forfeits the issue on appeal]; *People v. Pinholster* (1992) 1 Cal.4th 865, 935 [questions relating to the admissibility of evidence are forfeited in the absence of an objection in the trial court].)

amendments became effective January 1, 2022. Section 1172.6, subdivision (g) provides that a person whose conviction for attempted murder is not final may challenge on direct appeal the validity of that conviction based on the changes made to sections 188 and 189 by Senate Bill No. 1437.

Camacho and the Attorney General agree that the natural and probable consequences doctrine is no longer a valid theory of guilt for attempted murder and thus the trial court instructed on legally valid and invalid theories of guilt. When a jury is instructed on both legally valid and invalid theories, we "presume the legally invalid theory infected the verdict because jurors are not ""equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . ."" (*In re Martinez* (2017) 3 Cal.5th 1216, 1224 . . . .)" (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196–197 (*Sanchez*).) Under such a circumstance, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*); *Sanchez, supra,* 75 Cal.App.5th at p. 197.)

### 1. Background

The trial court instructed the jury that it could convict Camacho of attempted murder as a direct perpetrator, a direct aider and abettor, an aider and abettor under the natural and probable consequences doctrine, or as a conspirator under the natural and probable consequences doctrine. (CALJIC Nos. 3.00 [Principals—Defined]; 3.01 [Aiding and Abetting—Defined]; 3.02

21

[Principals—Liability for Natural and Probable Consequences]⁷; 6.11 [Conspiracy—Joint Responsibility]⁸.)

---

⁷ Specifically, the trial court instructed the jury on the natural and probable consequences theory as follows:  "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime original aided and abetted.

"In order to find the defendant guilty of the crime of attempted murder, as charged in count 3, you must be satisfied beyond a reasonable doubt that:

"1.    The crime of assault with a deadly weapon was committed.

"2.    That the defendant aided and abetted that crime.

"3.    That a co-principal in that crime committed the crime of attempted murder; and

"4.    The crime of attempted murder was a natural and probable consequence of the commission of the crime of assault with a deadly weapon.

"In determining whether a consequence is natural and probable, you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.

"A natural consequence is one which is within the normal range of outcome that may . . . reasonably be expected to occur if nothing unusual has intervened.

"Probable means likely to happen."

⁸ The trial court instructed the jury, in part, "A member of a conspiracy is not only guilty of the particular crime that to his or her knowledge his or her confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime of a co-conspirator to further the object of the

22

During closing argument, the prosecutor argued that Camacho and Muniz conspired to assault Duran and thus the jury could convict Camacho of attempted premeditated murder under a natural and probable consequences theory. The prosecutor argued, "A member of a conspiracy committed another crime. In this case, it is to further the conspiracy. Mr. Muniz tried to kill Mr. Duran, and that attempted murder was a natural and probable consequences.

"All of that simply said, Mr. Camacho, Mr. Muniz, joined into this plan. Mr. Camacho thought all along, all that is going to take place is an assault, that they were just going to beat up on Mr. Duran. If Mr. Muniz had any other intention, regardless of whether Mr. Camacho knows what he is going to do, Mr. Camacho is on the hook for that. So again, it's a natural and probable—does a reasonable person, what they think, if someone is going to beat up a human being with a dangerous or deadly weapon, could they possibly kill them? Of course, depending on where they hit them, depending on how many times they hit them. So in this case, I don't need to show to you that Mr.

---

conspiracy, even though that crime was not intended as a part of the agreed upon objective and even though he or she was not present at the time of the commission of that crime.

"[¶] . . . [¶]

"In determining whether a consequence is 'natural and probable' you must apply an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural consequence' is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen."

Camacho had the personal intent that he personally wanted to kill Jose Duran or even that he knew that Mr. Muniz came over there and was going to kill him.  That is not what the law requires, because as soon as they enter into the agreement to attack [Duran] and to assault him, anything that happens that is reasonable, anything that is a natural and probable consequence of that, he is on the hook for.  That's why this rule applies, even if the act was not [a part] of the original plan.

"Again, members of the jury, that is exactly why Mr. Camacho is also, and he is guilty of the attempted murder, and that is premeditated, deliberate and willful.  They worked and acted as a team in this case."

In rebuttal closing argument, the prosecutor again explained to the jury the prosecution's theory that Camacho was guilty of Duran's attempted murder as the natural and probable consequence of a conspiracy.  The prosecutor argued that after Camacho's first fight with Duran, Camacho spoke with Maribel who in turn called Muniz stating, "'It's a hood thing.'"  Muniz then showed up and assaulted Duran.  The prosecutor argued, "The law in this case is that they called over a gang member, and they felt the only thing that could have happened, Mr. Camacho only thought that Mr. Muniz was coming over to help him beat this guy up.  At the very least, the fact that Mr. Muniz had a different mind frame, that he took that assault one step forward, that is natural and probable consequences."

Later, the prosecutor added, "If you believe that [Camacho] at least agreed this assault was going to happen, then you should know that a natural and reasonable thing that could happen when you are trying to just assault someone, punch someone, if you do it strong enough, you do it with the right thing, which is a

hammer, that can cause someone death.  That is all the evidence you need in order to find Mr. Camacho also guilty of the attempted murder."

Finally, the prosecutor concluded, "Two men, one beats someone in the head, the other one punched him as he was on the floor.  That is the assault.  One did it and the other one aided and abetted him.  They are guilty of that.  [¶]  During that process, one person, yes, he intended to kill him.  Mr. Muniz intended to kill him by the number of times and the place that he kept striking him.  Because Mr. Camacho agreed to enter into that conspiracy to commit an assault, he should have known someone could possibly be killed, and because he should have known that, he is also guilty of the attempted murder."

2.    Analysis

The Attorney General argues the trial court's error was harmless beyond a reasonable doubt because "Camacho's actions during and after the assault show that he planned the attempted murder with his co-conspirator Muniz."  The trial prosecutor assessed the evidence differently.  In her initial closing argument, the prosecutor argued, "Mr. Camacho thought all along, all that is going to take place is an assault, that they were just going to beat up on Mr. Duran."  In her rebuttal closing argument, the prosecutor argued, "The law in this case is that they called over a gang member, and they felt the only thing that could have happened, Mr. Camacho only thought that Mr. Muniz was coming over to help him beat this guy up.  At the very least, the fact that Mr. Muniz had a different mind frame, that he took

that assault one step forward, that is natural and probable consequences."

The Attorney General further argues that the People presented strong evidence that Camacho directly aided and abetted the attempted murder. According to the Attorney General, the evidence showed that Camacho and Duran were members of rival gangs who engaged in a fistfight. After Duran left, Camacho and his fellow gang member and girlfriend Maribel spoke. Maribel then called fellow gang member Muniz and told him the fight was "'a hood matter.'" Soon after, Camacho and Duran resumed their fistfight. Muniz then arrived and struck Duran on the head several times with a hammer. Camacho did not intervene or otherwise indicate that he did not intend for a lethal attack. Instead, he continued to punch Duran in the face. Camacho and Muniz left the property together.

The evidence the Attorney General cites is evidence from which a reasonable jury might have found Camacho guilty of Duran's attempted murder on a direct aiding and abetting theory. It is not, however, evidence that shows that the trial court's erroneous natural and probable consequences instructions were harmless beyond a reasonable doubt, particularly in light of the prosecutor's arguments to the jury. (*Aledamat, supra*, 8 Cal.5th at p. 3; *Sanchez, supra*, 75 Cal.App.5th at p. 197.) Accordingly, we reverse Camacho's attempted murder conviction.

Upon issuance of the remittitur, the prosecution may retry Camacho for willful, deliberate, and premeditated attempted murder. (*People v. Perez* (2022) 78 Cal.App.5th 192, 205, review granted Aug. 17, 2022, S275090 [double jeopardy is not implicated where Senate Bill No. 775 required reversal of an attempted murder conviction]; *People v. Hola* (2022) 77

26

Cal.App.5th 362, 376, fn. omitted ["[W]hen there is a change in the law during an appeal that invalidates a previously valid legal theory relied upon by [the] prosecution and reversal is thereby warranted, a new trial should be permitted on legally valid theories"].)

E.    *Remaining Issues*

In addition to the issues defendants raised and we addressed above, Camacho raises several sentencing issues, some of which may apply to Muniz and some of which the Attorney General concedes, and a clerical issue.  Because we reverse Camacho's attempted murder conviction and Camacho's and Muniz's gang sentence enhancements and remand for further proceedings, we do not reach these issues.  Under the full resentencing rule the trial court is to address these issues on remand.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## IV. DISPOSITION

Camacho's willful, deliberate, and premeditated attempted murder conviction and Camacho's and Muniz's gang sentence enhancements are reversed. The matter is remanded to allow the prosecution to decide whether to retry Camacho on the willful, deliberate, and premeditated murder charge and Camacho and Muniz on the gang sentence enhancement allegations. Whether or not the prosecution elects to retry either defendant, the trial court is to resentence defendants under the full resentencing rule. The judgments are otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KIM, J.

We concur:



BAKER, Acting P. J.



MOOR, J.


28